## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KEESYA D. ROSS,                              :

      Plaintiff,                         :        Case No. 3:13cv00038

 vs.                                        :        District Judge Timothy S. Black
                                                      Chief Magistrate Judge Sharon L. Ovington

TELEPERFORMANCE USA,                         :
INC., et al.,
                                             :
      Defendants.
                                             :

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

On February 6, 2013, Plaintiff Keeysa D. Ross brought this case *pro se* against her former employer, TPUSA, Inc. (d.b.a. Teleperformance USA), and many of her former fellow employees, supervisors, or managers.  Plaintiff submitted a copy of the Notice of Right to Sue she received from the United States Equal Employment Opportunity Commission, dated November 8, 2012.  (Doc. #22-3, PageID# 216).

On June 4, 2013, Plaintiff filed her First Amended Complaint.  (Doc. #22).  In addition to other federal and state law claims, Plaintiff appears to bring claims for race- and sex-based discrimination, as well as retaliation, in violation of Title VII of the Civil

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Ohio Rev. Code § 4112 *et seq.*[2]

This case is presently before the Court upon Defendants TPUSA, Inc., Mynette Murrell, Matt Kilmer, Troy Naboors, Brian Throckmorton, Christopher Stewart, and Calbert Duvall's Motion to Dismiss Plaintiff's Amended Complaint (Doc. #25), and the record as a whole.

## II.     Plaintiff's Amended Complaint

Plaintiff's Amended Complaint is approximately 27 pages, with 46 pages of attached exhibits.  Plaintiff is African-American, and alleges all individuals named as defendants in this case are white.  Plaintiff worked as a customer service representative for Teleperformance in an in-bound call center in Fairborn, Ohio, from June 20, 2011 until her termination on June 19, 2012.  (Doc. #22–10, PageID# 249).  On the date of her termination, Plaintiff states that a human resources representative, Calbert Duvall, informed her that she was being terminated from her position with the company due to "unprofessional conduct."  (Doc. #22, PageID# 199-200).  Plaintiff argues, however, she was terminated in retaliation for complaining about alleged race- and sex-based discrimination and for plans to file a complaint with the EEOC.  Plaintiff brings this case *pro se* against her former employer, TPUSA, Inc., and many of her fellow former employees, supervisors, or managers.

---

[2] Plaintiff's Title VII claims extend only to Defendant TPUSA, Inc.  Plaintiff previously attempted to raise Title VII claims in her Complaint against all defendants, however, the Court dismissed such claims against individual defendants and advised Plaintiff she was not permitted to attempt to re-introduce these claims upon filing her Amended Complaint.  (Doc. #21, PageID# 180).

Plaintiff alleges that she "was an outstanding employee" at Teleperformance, and if she had not been harassed or discriminated against, there is "no telling the productivity I could still be achieving at this company."  (Doc. #22, PageID# 205).

Plaintiff claims the harassment began on March 24, 2012.  Plaintiff recounts that on this day – while fielding a customer call that needed to be escalated to a supervisor – she raised her hand from her desk, pursuant to company protocol, and a supervisor, Brian Throckmorton, arrived.  According to Plaintiff, Throckmorton, did not help her.  Instead, he stated he was "busy," but did arrange for another supervisor, Troy Naboors, to assist Plaintiff instead.  Plaintiff complains that Naboors did not appropriately handle the call and the customer ended the call before the issue was resolved.  As a result of the way the call ended – due to Naboors's allegedly improper handling of it – Plaintiff claims there was a problem with her phone system which resulted in several later calls not being appropriately handled and subsequently abandoned through no fault of her own.  Because Plaintiff's monthly bonus is tied to her performance stats, she alleges she "immediately expressed my concern about this occurrence with my supervisor (Brian Throckmorton) . . . ."  (Doc. #22, PageID# 187).  Plaintiff alleges Throckmorton informed her "not to worry about mak[ing] notes on the calls that came in unhandled and [they] would not effect me."  (*Id.*).

A week after the incident – on March 31, 2013 – Plaintiff claims she was approached by another supervisor, Chris Stewart, who informed her that "Throckmorton said you [are] not going to [be] getting [a bonus] this month."  (Doc. #22, PageID# 188).

3

Upon hearing this, Plaintiff alleges she approached Throckmorton "to discuss the reason I was not qualifying for a bonus this month." (*Id.*). According to Plaintiff, Throckmorton told her he was not going to discuss the issue at that time, but she again "asked him to explain to me why I would not be receiving a bonus." (*Id.*). At this time, Throckmorton allegedly told Plaintiff it was because she "had not reached [her] goal for tool completion for the month [of March]." (*Id.*). Plaintiff continued to question Throckmorton.

She alleges she next asked him how this was possible because she was told her "numbers were good." (*Id.*). According to Plaintiff, Throckmorton began to yell at her, "saying he was not going to discuss this with [her] at this time." (*Id.*). Plaintiff again continued to press the issue, stating, "I didn't understand and requested again an explanation to why I would not receive my bonus and how it was possible that my tool completion requirements where [sic] not met for the month." (*Id.*). Plaintiff alleges Throckmorton raised his tone with her again, and stated that he would "put me on an immediate final write up . . . if I insisted on continuing discussing this matter because he did not feel well and was not willing to deal with my concern at this time." (*Id.*). Plaintiff alleges "[a]t this time I once again repeated to him I did not understand and expressed my frustrations and requested if I could leave early and not remain for the approximately 40 minutes left on my regular scheduled work shift for the day and expressed I would be more than willing to take .25 for early departure due to my frustration, I did not feel as if I can be customer friendly without having this issue resolved in reference to my bonus." (*Id.*).

4

At this time, Plaintiff alleges Assistant Contact Center Manager (ACCM) Brian Harris asked Throckmorton and Plaintiff to come to his office to discuss the issue. According to Plaintiff, she began to tell Harris about what happened on March 24, 2012 with the escalated call that was improperly handled by Naboors and how this negatively impacted her monthly stats and prevented her from earning her March bonus. Plaintiff alleges "[a]t that time on 3/31/12 Brian Harris pulled up my monthly reporting stats on a spreadsheet and began reviewing them with me, he then stated for 03/24/12 my daily tool completion was under 90% and was in fact the reason my tool completion had fallen below monthly goal expectations but due to the fact of the exception time that had been granted and the issue he could factor those abandoned calls back in and determined that was the reason and in turn could therefore pay me the bonus for March." (*Id.*). Plaintiff stated she received her bonus in her paycheck on April 22, 2012. According to Plaintiff, however, "[t]his incident was the beginning of the harassment [sic] I begin [sic] to endure from March 24, 2012 up until termination on June 19, 2012." (*Id.*).

The next day, on April 1, 2012, Plaintiff did not return to work as scheduled. Instead, she stated, "I called off to regain my ability to cope with how I had been subjected to abuse of authority, intimidation, and bullying by Brian Throckmorton, Troy Naboors, and Chris Stewart and how their efforts almost had resulted in me not receiving my well earned bonus for the month of March productivity as an intentional tort." (Doc. #22, PageID# 190).

Plaintiff claims the harassment continued, and that on April 8, 2012, she was again

5

"treated unfairly on another escalated call . . ." (Doc. #22, PageID# 190). During this incident, Plaintiff alleges that her mentor, "Wendell," took the call but "stayed on the phone with the customer for over an hour and the call was unnecessarily triple escalated to Chris Stewart," and "Chris Stewart then got on the phone for another approximate two hours on a 'simple exchange on a phone' . . ." (*Id.*). Plaintiff complains this action was done intentionally by Chris Stewart, she "was unable to go on a break or lunch," and was given a "write up" by Throckmorton for a "verbal warning" on April 10, 2012 due to the length of her phone call "handle time" for that day. Plaintiff alleges "[t]his yet was a type of harrassment [sic] that began to continue by supervisor Troy Naboors, Brian Throckmorton, and Chris Stewart in regards to any time from that point on . . ." (Doc. #22, PageID# 191).

Plaintiff alleges she was "taunted" by a white co-worker, Amy S., on May 26, 2012. Specifically, Plaintiff alleges this co-worker did not receive any calls for four hours and joked about not receiving calls during this period. Plaintiff alleges Throckmorton knew about this, but that he informed her there was nothing wrong with the system: Amy S. was showing as "available" and everything was functioning correctly. Plaintiff alleges Throckmorton speculated that Amy S. might not be receiving as many calls because she was not qualified to receive the same types of calls as Plaintiff due to her skill level being lower.

Plaintiff alleges that from June 2, 2012 through June 9, 2012, she was intentionally placed in a system mode where she only received one type of customer calls, which

resulted in her receiving back-to-back phone calls for the entirety of her shift "while other employees on the call center floor would be waiting in between calls with long wait times . . ." (Doc. #22, PageID# 192). Plaintiff stated she complained about this to Throckmorton on June 10, 2012, but he stated the system indicated she could receive both types of calls: "save" calls and "concierge" calls. Plaintiff alleges that at this point Throckmorton informed her that she was late from returning from her break by 21 seconds the previous day, and would need to provide her a written warning." (*Id.*). She also alleges he informed her that if she was late again tomorrow she would be terminated. (*Id.*).

Plaintiff alleges that on June 12, 2012, she began to feel ill at work because she felt "overwhelmed by the harassment" and "overworked." (Doc. #22, PageID# 194). According to Plaintiff, when she requested to leave because she was feeling ill, Throckmorton provided her permission to do so.

Plaintiff did not return to work the next day, on June 13, 2012. She called off and went to the emergency room due to "the harrassment [sic], staying up all night writing the Eeoc intake complaint I began to experience anxiety, vomiting and headaches which was in direct relation to the experiences I was documenting . . ." (*Id.*). Plaintiff returned to work on June 14, 2012, and alleges she brought a note from her physician for her absence on June 13th and early departure on June 12th. (*Id.*).

Plaintiff claims that between June 14, 2012 and June 17, 2012, the harassment worsened. She claims that on June 16, 2012, she was informed by Throckmorton that

7

Brian Harris would be placing her on an action plan due to her attendance.  Plaintiff stated that Harris then approached and spoke with her about the action plan.  He informed Plaintiff of the points that she had already accumulated, and that if she called off anymore in the next several weeks (and thus accrued more points) she would be terminated.

Plaintiff alleges that "at that time I began discussing the issues I had been having on the job [and] he asked me to come into his office which I did and when he closed the door I began telling him about the harrassment [sic] and the numerous threats of being fired for the last 3 months which I had made him aware of one incident dated on 03/24/12 and he did nothing about the report made to him of Brian Throckmorton and Troy Naboors['] inappropriate behavior which had increased my harassment because I had reported their behavior to him, and had gotten to this point and I had already contacted the EEOC and would be filing a charge."  (Doc. #22, PageID# 195).

Plaintiff claims she then informed Harris about the sickness and anxiety she has been experiencing from work, and asked to be given personal leave or medical leave "to protect my job while I get medical assistance."  According to Plaintiff, Harris stated that he could not do anything about her request until Human Resources returned to the office on Monday.  According to Plaintiff, she then asked him if she could just leave for the day and return after she had a chance to discuss everything with Human Resources later in the week.  Harris told her "no," and advised her that if she left "he would be forced to terminate me for policy and procedure . . . ." (*Id.*).  At this time, Plaintiff alleges she asked him "if anything happened to me onsite was he willing to be liable, since he was

8

forcing me to continue to work in a obvious increasingly hostile environment, he stated he would take accountability if that occurred and requested I returned to work which I did . . . ." (*Id.*).

Plaintiff claims that for the rest of the day she experienced numerous system issues and believes "this was yet another form [of] harassment by management done to make me uncomfortable and frustrated and increase the anxiety I was already exhibiting." (*Id.*).

The next day, on June 17, 2012, Plaintiff claims she was again subjected to "hostile" comments.  Plaintiff alleges another employee, "Chelsea," was upset because she was written up by her supervisor for a 20 second break overage, he had never done this before, and she stated she "was gonna kick someone['s] ass . . ." (Doc. #22, PageID# 196).

Later, when Plaintiff's shift ended and she clocked out at 8:08 p.m., Plaintiff alleges she "proceeded to reach for my keys on the desk and at that time I noticed my keys were missing I began to think back on where they may be and realized I did go to the bathroom approximately at 6:51 on break and returned to my desk at approximately 6:54 so I went to the bathroom and searched all the stalls and the trash cans to see if my keys were there and they were not." (Doc. #22, PageID# 196).  Plaintiff alleges that after she checked the restroom twice, she spoke with a supervisor, Charles Tyree.  Plaintiff claims she asked Tyree if anyone had turned in a set of keys, and he replied "no." (*Id.*).  Plaintiff alleges she then "made an announcement my keys are missing and please return them they are distinctive and are Mercedes Benz keys, so if they were picked up the

9

person had to be aware they were mine for I was the only one who drove that type of vehicle employed at Teleperformance." (*Id.*). Plaintiff claims she then told Tyree, "if my keys were not returned I would call law enforcement and have the facility searched." (Doc. #22, PageID# 197).

After this, Plaintiff alleges Tyree asked her if they could go outside and check if her keys might be locked in her car. Plaintiff agreed, and the two went outside to check her vehicle for the missing keys. After checking her car and still not locating the keys, Plaintiff became upset and "ran off to Family Dollar and contacted [her] dad for assistance." (*Id.*). Plaintiff claims that when she returned to her vehicle she saw Tyree bringing her car keys to her. When Plaintiff asked who had them, Tyree stated "Josh Bennington."[3] (*Id.*). Plaintiff alleges she then took the keys and drove home.

The next day, on June 18, 2012, Plaintiff called Teleperformance's corporate hotline to leave "a message to what had occurred and how I had been treated by management and coworkers." (Doc. #22, PageID# 197-98). Plaintiff claims she was contacted later that day by a woman who identified herself as "Nikki," from Human Resources. Plaintiff explains that she told this woman about "the incidents that had occurred," and after discussing the issues for 20 minutes, the woman stated she was actually Mynette Murrell. (Doc. #22, PageID# 198). Plaintiff alleges that upon learning "Nikki" was actually Mynette Murrell, "I began to cry and panic because at that point half

---

[3] Josh Bennington is another supervisor at Teleperformance

10

of the allegations I was making were part of her job performance which put her on the defense and from experience the more I discussed my issues in the more unfair treatment and intimidation I had experienced instead of the issues being resolved, I stated I did not know that I was speaking to her and requested that I did not speak with her due to a conflict of interest and hung up the phone she proceeded to call me back but I did not answer and decided to call the corporate hotline again to make them aware of this situation." (Doc. #22, PageID# 199). Plaintiff alleges that the local police department came to her house about 15 minutes later and "stated that they were there to make a follow up because they had received a call." (*Id.*). Plaintiff believes that Mynette Murrell "sent the police over [to] my house to intimidate me not in an effort for assistance . . ." (*Id.*).

The next day, June 19, 2012, Plaintiff did not report to work. Plaintiff alleges she did not go to work "due to emotional distress and anxiety," and in order to take time to seek medical assistance. Plaintiff claims she "was hoping that I would be contacted with a personal or medical leave which I had requested in order to protect my job while these allegations were investigated," but that, "I received a call from a party who stated their name to be 'Calbert Duvall' from corporate Human Resources and that he wanted me to tell him what was going on." (Doc. #22, PageID# 199). Plaintiff claims she told him about all the incidents that had occurred since March 24, 2012, and "how I was being harrassed [sic] and discriminated against by employees, management, and supervisors." (*Id.*). Plaintiff alleges, "I was then interrupted by Calbert Duvall whom stated during this

11

call he received six statements that stated that I was the one harrasing [sic] employees and used profanity on the call center floor as well as threatening employees on the call center." (*Id.*).  Plaintiff alleges "I told him that was not true, I did not and would not use profanity at work I had no reason too [sic], I had already been in contact with the EEOC, and there was no reason for me to behave in that manner." (*Id.*).  Plaintiff alleges "[h]e then proceeded to state he would move forward with my termination because of this, and I would receive my separation notice and it would state I was terminated for extreme unprofessional behavior and I politely said Thank you I did not want to work in that kind of environment where it was okay for me to be harrased [sic], discriminated against, and threatened, and the call was ended mutually." (*Id.*).

III.  **Motion to Dismiss**

To determine whether a complaint states a claim upon which relief can be granted, the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

In order "to survive a motion to dismiss a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements.' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 1965, 167 L. Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge – whether the Complaint raises a right to relief above the speculative level – "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008)(quoting in part *Twombly*, 127 S. Ct. At 1965). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft . Iqbal*, 556 U.S. 884, 129 S. Ct. 1937, 1949, 173 L. Ed.2d 868 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed.2d 1081 (2007))(quoting *Twombly*, 127 S. Ct. at 1964). "Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 233, 242, 179 L. Ed. 2d 233, 236 (2011).

**IV.** **Analysis**

13

Plaintiff's *pro se* Complaint is lengthy, and, at many points, difficult to understand. By Defendants' count, Plaintiff appears to be raising a total of (76) seventy-six claims against her former employer, Teleperformance, as well as (8) eight of her former co-workers "in there [sic] individual and official capacity."  (Doc. #22, PageID# 185).  The allegations stem primarily from a series of events that allegedly occurred between March 24 and June 19, 2012, during which time Plaintiff believes the "Defendants' [sic] Conspired together to harass and intimidate [her] off the job due to the fact [she] was a black female that was contacting the Eeoc and exercising [her] civil and constitutional rights of freedom of expression."  (Doc. #22, PageID# 205).

Liberally construing Plaintiff's Amended Complaint, it appears she is attempting to bring claims for disparate treatment race- and sex-based discrimination, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Ohio Rev. Code § 4112 *et seq.*  It also appears Plaintiff is attempting to bring an additional claim under 42 U.S.C. § 1983 for First Amendment retaliation, as well as state law claims for defamation, intentional infliction of emotional distress, and violation of the Ohio Whistleblower Act, Ohio Rev. Code § 4113.52.  (Doc. #22, PageID## 182-208). The Court does not find any other federal or state law claims have been raised, nor require consideration herein.  *See Wells v. Brown,* 891 F.2d 591, 594 (6th Cir. 1989) ("Although *pro se* pleadings are to be liberally construed, we are not required to conjure up allegations not pleaded or guess at the nature of an argument."); *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1277 (4th Cir. 1985).

14

Defendants TPUSA, Inc., Mynette Murrell, Matt Kilmer, Troy Naboors, Brian Throckmorton, Christopher Stewart and Calbert Duvall request the Court dismiss Plaintiff's "Revised First Amended Complaint and Demand For [sic]," filed on June 4, 2013.  (Doc. #25, PageID# 268).  Defendants provide several arguments in favor of dismissal, which will be evaluated below.  Plaintiff was mailed a Notice by the Court on June 19, 2013, informing her that Defendants filed a motion to dismiss and timely response was due not later than July 15, 2013.  (Doc. #27). To date, Plaintiff has not responded.[4]

### A.    Title VII Claims

Plaintiff "seeks remedy for violation of Title VII . . . under the basis of race, sex, and retaliation against Defendant TPUSA . . . ." (Doc. #22, PageID# 185).  Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-2(a)(1); *see also* 29 C.F.R. § 1614.101(a). Retaliatory discrimination is also prohibited against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a); *see also* 29 C.F.R. § 1614.101(b).

Plaintiff is not required to establish a prima facie case under *McDonnell Douglas*

---

[4] Although Plaintiff filed an "Urgent Motion for Appointment of Co-Counsel" (Doc. #32) on September 24, 2013, she has not responded to Defendants' Motion to Dismiss despite the Court's Notice for her to do so.

15

and its progeny in order to survive a motion to dismiss her Title VII discrimination claims. *Keys v. Humana*, 684 F.3d 605, 609 (6th Cir. 2012). Rather, Plaintiff must only allege sufficient "factual content" from which the Court, utilizing its "judicial experience and common sense," is able to "draw the reasonable inference," *Iqbal*, 556 U.S. at 678, 679, that Teleperformance "discriminate[d] against [Plaintiff] with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Keys*, 684 F.3d at 610.

If Plaintiff's Title VII claims for disparate treatment employment discrimination based on race or sex are plausible, "the availability of other explanations – even more likely explanations – does not bar the door to discovery." *16630 Southfield Limited Partnership v. Flagstar Bank*, 2013 U.S. App. LEXIS 16798, *8 (6th Cir. 2013). At the same time, the Court must not "assess the plausibility of an inference in a vacuum." *Id.* at *8-*9. That is, "[t]he reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations." *Id.* at *9.

The factual matter in Plaintiff's Amended Complaint does not support an inference of race- or sex-based discrimination. An employment discrimination case may be based upon direct or circumstantial evidence. *Johnson v. Kroger Co.,* 319 F.3d 858, 864-65 (6th Cir. 2003). Plaintiff has not alleged any direct evidence of discrimination, and the alleged events relied upon in her Amended Complaint as the basis for her disparate treatment employment discrimination claim likewise do not support a plausible

16

inference of discrimination.  Plaintiff may believe every negative event that allegedly occurred at work starting on March 24, 2012 was done purposely with a discriminatory intent, but "[m]ere personal belief, conjecture and speculation are insufficient to support an inference of . . . discrimination."  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).  For example, the Court cannot infer discriminatory intent due to the fact Plaintiff's supervisor, Brian Throckmorton, told her he was "busy" and could not personally assist her with an escalated customer call on March 24, 2012, even if he was not actually "busy" during this time.  The Court likewise cannot infer discriminatory intent due to the fact Throckmorton arranged for another supervisor, Troy Naboors, to assist Plaintiff instead, or that Naboors allegedly provided inadequate assistance, even if it did "almost . . . result[ ] in [Plaintiff] not receiving [her] well earned bonus for the month of March . . . ." (Doc. #22, PageID# 190).

Plaintiff believes the disparate treatment continued into the following month, when she alleges she was again "treated unfairly on another escalated call," on April 8, 2012. On this date, Plaintiff alleges her mentor, Wendell, purposely prolonged a customer call for over an hour, and then another supervisor, Chris Stewart, "intentionally" kept the caller on the line for another two hours, causing her to miss her break and lunch, and later be given a verbal warning regarding the "handle time" of her calls.  (Doc. #22, PageID# 190).  Accepted as true, such allegations, however, do not raise an inference of discrimination, let alone a plausible one.

Plaintiff's remaining allegations also do not support a plausible inference of

17

discrimination.  For example, Plaintiff alleges a white employee, Amy S., did not receive

any calls for four hours on May 26, 2012, and that management was aware of the issue

but could not find any problem with the call system: the employee was showing up as

"available" and the system appeared to be functioning correctly.  (Doc. #22, PageID##

191-92).  Plaintiff alleges that when she made a comment directly to the employee about

how "everytime I take a call I'm making a dollar [of bonus pay] . . . because I'm saving

my customers [from cancelling services] . . . [i]mmediately after I made this statement

miraculously Amy . . . began receiving calls during the remainder of our shift and the

taunting discussions ended."  (Doc. #22, PageID# 192).  Plaintiff alleges this was another

instance of discrimination, yet Amy S. was the only employee who was not receiving

calls during this isolated event.  Thus, it is difficult to infer how Plaintiff was being

discriminated against when the remaining call center employees, apparently comprised of

various races and sexes, were also receiving calls.  Moreover, the fact, as Plaintiff alleges,

that Amy S. started receiving calls immediately after she reminded her that she was

forgoing the potential for a $1/call bonus, seems to indicate the employee's reduction in

calls may have been less likely the result of a conspiracy with management to harass

Plaintiff, and more plausibly, if anything, the result of employee "aux abuse" (i.e., an

employee's use of a feature on the call system to prevent calls from coming in).

Regardless, Plaintiff's allegations relating to this event do not support a plausible

inference of discrimination.

       Plaintiff's allegation that she received back-to-back customer calls from June 2,

2012, through June 9, 2012, "while other employees on the call center floor would be waiting in between calls with long wait times . . ." likewise does not infer discrimination. Specifically, Plaintiff does not indicate the race or sex of the employees allegedly treated more favorably, and even if she had, it seems implausible that somehow her employer was purposely prolonging her calls, or sending her more time-consuming calls, while simultaneously funneling shorter call inquiries to every other call center employee. Plaintiff's allegation that her supervisor failed to take corrective action against an employee who threw a football over her head during a meeting on June 14, 2012, likewise fails to support an inference of discrimination. Accepting Plaintiff's allegations as true, and construing them liberally in her favor, the Court finds she has failed to set forth a plausible claim to relief under Title VII for disparate treatment employment discrimination based on race or sex.

On the other hand, Plaintiff has stated a plausible claim for relief under Title VII's retaliation provision. Title VII prohibits retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an allegedly unlawful employment practice. 42 U.S.C. § 2000e-3(a). The prima facie case consists of four elements: (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected

activity and the adverse employment action or harassment.  *Garner v. Cuyahoga Cnty.*

*Juvenile Court,* 554 F.3d 624, 639 (6th Cir. 2009).

     The United States Court of Appeals for the Sixth Circuit has "repeatedly held that

complaints to human resources personnel regarding potential violations of Title VII

constitute protected activity for purposes of establishing a prima facie case of retaliation."

*Trujillo v. Henniges Auto. Sealing Sys. N. Am.*, 2012 U.S. App. LEXIS 21763, *10 (6th

Cir. 2012) (internal citations omitted).  Moreover, a plaintiff "opposing an apparently

discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must

only have a good faith belief that the practice is unlawful."  *Booker v. Brown &*

*Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989).

     Plaintiff alleges she informed human resources personnel on June 17, 2012 about

possible discrimination and was thereafter terminated on June 19, 2012.  (Doc. #22,

PageID# 202).  Plaintiff alleges she was told she was being terminated for unprofessional

conduct stemming from an incident that occurred on the call center floor on June 17,

2012, involving her missing car keys, however, Plaintiff alleges she was actually

terminated as retaliation for complaining to human resources and pursuing charges with

the EEOC.  "Where an adverse employment action occurs very close in time after an

employee learns of a protected activity, such temporal proximity between the events is

significant enough to constitute evidence of a causal connection for the purposes of

satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d

516, 525 (6th Cir. 2008).  Here, Plaintiff alleges she made her complaints with human

resources two days prior to her termination, and that she informed them she believed she was being discriminated against based on her race and sex.  Based on her allegations, taken as true and construed in her favor, Plaintiff has stated a plausible claim for relief under Title VII's retaliation provision.  Accordingly, this claim should not be dismissed.

> **B.      Ohio Employment Discrimination Claims**

Plaintiff also appears to bring discrimination claims pursuant to Ohio Rev. Code § 4112 against Teleperformance, as well as individual Defendants Mynette Murrell, Troy Naboors, Brian Harris, Brian Throckmorton, Calbert Duvall, Charles Tyree, Janette Jack, Chris Stewart, and Matt Kilmer.

Although individual defendants cannot be held personally liable under Title VII, *see Wathen General Elec.*, 115 F.3d 400, 405-06 (6th Cir. 1997), the Supreme Court of Ohio has determined that individual supervisors and managers may be held jointly or severally liable with their employer for their own violations of Ohio Revised Code § 4112, Ohio's anti-discrimination law.  *Generao v. Cent. Transp., Inc.*, 84 Ohio St. 3d 293, 1999 Ohio 353, 703 N.E.2d 782, 785 (Ohio 1999).  "The same analysis generally applies to claims under Title VII and the [Ohio Civil Rights Act]."  *Arnold v. City of Columbus*, 515 Fed. Appx. 524, 529 (6th Cir. 2013) (citing *Staunch v. Cont'l Airlines, Inc.,* 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981)).

As Plaintiff has failed to state a plausible claim for relief under Title VII for disparate treatment employment discrimination, the claims she raises under Ohio Rev.

Code § 4112.02(A)(2) based on the same facts must also be dismissed.

On the other hand, Plaintiff has sufficiently set forth a plausible claim for relief against Teleperformance under Title VII's retaliation provision, and thus, has also set forth a plausible claim for relief under Ohio Rev. Code § 4112.02(I), which "makes it unlawful to discriminate against those who oppose any unlawful discriminatory practice, or who make a charge, or participate in any discrimination investigation or proceeding."

Plaintiff, however, cannot likewise hold individual Defendants Mynette Murrell, Matt Kilmer, Troy Naboors, Christopher Stewart or Calbert Duvall liable for violation of Ohio Rev. Code § 4112.02(I).  The Supreme Court of Ohio has determined that, although liability also extends to individuals for their own violations of Ohio's anti-discrimination law, it only extends to supervisors and managers.  Thus, Murrell, Kilmer, and Duvall are not liable as they were human resources personnel, and thus, not Plaintiff's supervisor or manager.  Although they were supervisors at Teleperformance, Defendants Stewart and Naboors likewise cannot be held liable under the Ohio Civil Rights Act because neither one of them was Plaintiff's supervisor or manager.

As to Plaintiff's supervisor, Brian Throckmorton, there is no allegation he terminated Plaintiff's employment, had authority to terminate Plaintiff's employment, or was somehow involved in such a decision.  Moreover, Plaintiff has also not alleged that she told Throckmorton about her complaints to human resources or her plan to file a complaint with the EEOC.  Plaintiff also has not alleged that Throckmorton somehow knew about such facts.  Accordingly, Plaintiff has failed to state a plausible claim for

22

relief for retaliation under Ohio Rev. Code § 4112.02(I) against Murrell, Kilmer, Duvall, Stewart, Naboors, and Throckmorton. These claims should therefore be dismissed.

### C. First Amendment Retaliation

Plaintiff alleges she seeks "remedy for violation of my constitutional rights of freedom of expression against Defendants' Mynette Murrell, Charles Tyree, Calbert Duvall, Matt Kilmer, Troy Naboors, TPUSA, . . . Janette Jack, Brian Harris, and Brian Throckmorton in there [sic] official capacity as well as individually." (Doc. #22, PageID# 185).

Thus, Plaintiff appears to be asserting a claim under 42 U.S.C. § 1983 for First Amendment retaliation. 42 U.S.C. § 1983 provides a remedy for constitutional violations committed by state actors. This is problematic for Plaintiff because she has sued a private company and eight private individuals. "Private individuals and companies do not act under color of state law." *Thomas v. Better Bus. Bureau*, 79 Fed. Appx. 748 (6th Cir. 2003) (citing *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000)). "The only exception to this rule is if the actions of the private individual or corporation are so approximate to a state action that the action may fairly be attributed to the state." *Id.* Plaintiff has failed to set forth any factual allegations capable of indicating any Defendant's actions can be attributed to the state. Thus, as it is not plausible that any Defendant can be considered a state actor, any § 1983 claim Plaintiff seeks to raise must be dismissed.

### D. Defamation

Plaintiff "seeks remedy for defamation and slander . . . against Defendants' [sic] Mynette Murrell, Charles Tyree, Calbert Duvall, Matt Kilmer, Troy Naboors, TPUSA . . . Janette Jack, Brian Harris, and Brian Throckmorton in there [sic] official capacity as well as individually."  (Doc. #22, PageID# 185).

In order to maintain an action for defamation, Ohio law requires a plaintiff to prove: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the party of the defendant; . . . (5) that was either defamatory *per se* or caused special harm to the plaintiff."  *Gosden v. Louis*, 116 Ohio App.3d 195, 206, 687 N.E.2d 481 (Ohio Ct. App. 1996).  Two kinds of defamation exist: defamation *per se* and defamation *per quod*.  *Id.* at 207.  Defamation *per se* occurs when "material is defamatory on its fact."  *Id.* Defamation *per quod* occurs when "material is defamatory through interpretation or innuendo."  *Id.*

Plaintiff alleges Mynette Murrell made a "slanderous statement" about her while participating in a telephonic hearing before the Ohio Unemployment Compensation Review Commission.  Specifically, Plaintiff alleges Murrell stated that "[Keeysa Ross] thought [her co-workers] where [sic] in a conspiracy to kill [her]."  (Doc. #22, PageID# 203).  Even assuming Plaintiff never made this statement, she is nevertheless prohibited from bringing a defamation action based on this statement due to the fact the communication is quasi-judicial in nature and subject to privilege.  *See Baldwin v. Adidas America, Inc.*, 2002 U.S. Dist. LEXIS 19626, 2002 WL 2012562 (S.D. Ohio, July 29,

24

2002) (citing *Barilla v. Patella*, 144 Ohio App.3d 524, 760 N.E.2d 898, 906 (Ohio Ct. App. 2001)) ("Ohio accords an absolute privilege to communications made during unemployment proceedings on the grounds that they are quasi-judicial in nature.").

Aside from the comment allegedly made by Murrell, Plaintiff does not identify any other allegedly defamatory statement made by any other Defendant.  As such, Plaintiff has also failed to state a plausible claim for relief against Defendants TPUSA, Duvall, Kilmer, Naboors, and Throckmorton.  Accordingly, Plaintiff's claims for defamation should be dismissed.

### E.    Intentional Infliction of Emotional Distress

Plaintiff "seeks remedy for Intentional infliction of emotional distress against Defendants Mynette Murrell, Janette Jack, Brian Harris, Brian Throckmorton, Chris Stewart, Janette Jack, and TPUSA, Inc. in there [sic] individual and official capacity." (Doc. #22, PageID# 185).

To state a claim for intentional infliction of emotional distress in Ohio, a plaintiff must allege that "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citing *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App. 3d 73, 603 N.E.2d 1126 (Ohio Ct. App. 1991) and *Pyle v. Pyle*, 11 Ohio App. 3d 31, 11 Ohio B. 63, 463 N.E.2d 98 (Ohio Ct. App. 1983)).  Ohio courts

define extreme and outrageous conduct exceedingly narrow.  *See Godfredson v. Hess &*

*Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) ("[T]o say that Ohio courts narrowly define

'extreme and outrageous conduct' would be something of an understatement.").

Plaintiff does not identify specifically what conduct she believes supports her

intentional infliction of emotional distress claim.  Largely, however, her complaints of

being treated unfairly at work stem from the following alleged events:

- On March 31, 2012, she was told she was not going to receive her bonus for March by Chris Stewart.  She discussed the issue with a manager, Brian Harris, and he indicated they would make an exception and provide her the bonus.  She received the bonus in her paycheck on April 22, 2012.

- On April 8, 2012, a supervisor, Chris Stewart, allegedly prolonged a customer call he was handling for Plaintiff for approximately two hours. She did not get a break or lunch during this time.  Plaintiff was allegedly given a verbal warning for the incident, despite Stewart's involvement.

- On May 26, 2012, a co-worker, Amy S., allegedly received no calls for four hours while Plaintiff received numerous calls.  Amy S. allegedly bragged about not receiving any calls during this time.

- From June 2 – 9, 2012, Plaintiff allegedly received back-to-back customer calls during her entire shift while other co-workers had long wait times between calls.

- A co-worker allegedly intentionally threw a football over her head on June 14, 2012, and her supervisor, Throckmorton, failed to take corrective action.

- On June 16, 2012, Plaintiff allegedly experienced numerous computer system issues, which she believes were intentionally created by management to harass her.

- On June 19, 2012, Plaintiff was terminated from her job and allegedly told by a human resources representative, Calbert Duvall, it was for "extreme unprofessional behavior," stemming from an incident that occurred on June

17, 2012.

None of this conduct, nor any other allegation provided in Plaintiff's First Amended

Complaint, accepted as true and construed in her favor, could plausibly constitute

"outrageous and extreme conduct" necessary to set forth a claim for intentional infliction

of emotional distress under Ohio law.

With regard to the "outrageous and extreme conduct" element, the Ohio Supreme

Court explained:

> It has not been enough that the defendant has acted with an intent which is tortious
> or even criminal, or that he has intended to inflict emotional distress, or even that
> his conduct has been characterized by 'malice,' or a degree of aggravation which
> would entice the plaintiff to punitive damages for another tort.  Liability has been
> found only where the conduct has been so outrageous in character, and so extreme
> in degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community.  Generally the case is
> one in which the recitation of the facts to an average member of the community
> would arouse his resentment against the actor, and lead him to exclaim,
> 'Outrageous.'

*Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 6 Ohio B. 421, 453 N.E.2d 666, 671 (Ohio

1983) (overruled on other grounds) (internal quotation marks and citation omitted).

The Sixth Circuit "has previously held that 'an employee's termination, even if

based upon discrimination, does not rise to the level of 'extreme and outrageous conduct'

without proof of something more.'" *Talley v. Family Dollar Stores of Ohio*, 2008 U.S.

App. LEXIS 19342, *27 (6th Cir. 2008) (quoting *Godfredson*, 173 F.3d at 376).

Plaintiff's claims fail because she has not alleged facts supporting a plausible inference

that her emotional distress "was serious and of such a nature that no reasonable person

27

could be expected to endure it." *Ekunsumi v. Cincinnati Restoration, Inc.,* 120 Ohio App.

3d 557, 698 N.E.2d 503, 506 (Ohio Ct. App. 1997).  The alleged incidents, even if

unprofessional or unfair, simply do not support a plausible claim against TPUSA,

Murrell, Throckmorton, and Stewart for intentional infliction of emotional distress.[5]

### F.    Ohio Whistleblower Act

Plaintiff's whistleblower claim must also fail.  The relevant part of Ohio Rev.

Code § 4113.52(A)(1)(a) states:

> If an employee becomes aware in the course of the employee's employment of a
> violation of any state or federal statute or any ordinance or regulation of a political
> subdivision that the employee's employer has authority to correct, and the
> employee reasonably believes that the violation is a criminal offense that is likely
> to cause an imminent risk of physical harm to persons or a hazard to public health
> or safety, a felony, or an improper solicitation for a contribution, the employee
> orally shall notify the employee's supervisor or other responsible officer of the
> employee's employer of the violation and subsequently shall file with that
> supervisor or officer a written report that provides sufficient detail to identify and
> describe the violation.

Ohio courts require strict compliance with the whistleblower statute.  The Supreme Court

of Ohio emphasized that Ohio Rev. Code § 4113.52 "mandates that the employer be

informed of the violation both orally and in writing," and "[a]n employee who fails to

---

[5] Ohio law does not recognize claims of negligent infliction of emotional distress in the
employment termination context.  *Doe v. SexSearch.com*, 551 F.3d 412, 417 (6th Cir. 2008) (noting that
Ohio courts have limited "recovery for negligent infliction of emotional distress to instances where the
plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical
peril") (citing *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 86, 1995 Ohio 65, 652 N.E.2d 664 (1995); *Gearing
v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 40, 1996 Ohio 113, 665 N.E.2d 1115 (1996) ("Ohio courts have
limited recovery for claims alleging negligent infliction of emotional distress to situations such as where
the plaintiff was a bystander to an accident or was in fear of physical consequences to his own person.")).

provide the employer with the required oral notification and written reports is not entitled to statutory protection for reporting information to outside authorities." *Contreras v. Ferro Corp.*, 73 Ohio St. 3d 244, 248, 652 N.E.2d 940 (1995).

In this case, Plaintiff sets forth no allegations indicating she was aware "of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct," and that also constitutes "a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution . . . ." Ohio Rev. Code § 4113.52(A)(1)(a).  Moreover, Plaintiff also failed to set forth any facts capable of indicating she made both an oral and written report, as required by the statute.  *See id.*  Accordingly, this claim must be dismissed.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' TPUSA, Inc., Mynette Murrell, Matt Kilmer, Troy Naboors, Brian Throckmorton, Christopher Stewart and Calbert Duvall's Motion to Dismiss (Doc. #25) be GRANTED in part, and DENIED in part;

2. Plaintiff's Title VII claims against TPUSA, Inc., for disparate treatment employment discrimination based on race and sex be DISMISSED with prejudice;

3. Plaintiff's claims under Ohio Rev. Code § 4112.02(A)(2) against Defendants TPUSA, Murrell, Kilmer, Naboors, Throckmorton, Stewart, and Duvall be DISMISSED with prejudice;

4. Plaintiff's claims under Ohio Rev. Code § 4112.02(I) against Defendants Murrell, Kilmer, Naboors, Throckmorton, Stewart, and Duvall be DISMISSED with prejudice;

5. Plaintiff's claims under 42 U.S.C. § 1983 for First Amendment retaliation

against Defendants TPUSA, Murrell, Kilmer, Naboors, Throckmorton, Stewart, and Duvall be DISMISSED with prejudice;

6.    Plaintiff's state law claims for Defamation, Intentional Infliction of Emotional Distress, and violation of the Ohio Whistleblower Act against Defendants TPUSA, Murrell, Kilmer, Naboors, Throckmorton, Stewart, and Duvall be DISMISSED with prejudice;

7.    Murrell, Kilmer, Naboors, Throckmorton, Stewart, and Duvall be TERMINATED as Defendants; and,

8.    Plaintiff's claims under Title VII and Ohio Rev. Code § 4112.02(I) for retaliation against Defendant TPUSA remain pending.

September 25, 2013

    s/Sharon L. Ovington    
Sharon L. Ovington
Chief United States Magistrate Judge

30

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).