**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

KEESYA D. ROSS,                     :

      Plaintiff,                  :        Case No. 3:13cv00038

 vs.                               :        District Judge Timothy S. Black
                                             Chief Magistrate Judge Sharon L. Ovington
TELEPERFORMANCE USA,                :
INC., et al.,
                                    :
      Defendants.
                                    :

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff Keesya D. Ross was employed with TPUSA, Inc., d.b.a. Teleperformance

USA ("TPUSA"), as a customer service representative at its Fairborn, Ohio call center.

TPUSA operates inbound and outbound call centers on behalf of its clients to assist them

with customer care, technical support, and debt collection operations.  (Doc. #86-2,

*PageID#* 1285; Doc. #89, *PageID#* 1427).

Ross worked as a member of TPUSA's "Save Team."  Her job was challenging.

She was responsible for handling calls from customers seeking to cancel services of

TPUSA's client accounts.  It was one of Ross's primary goals on the Save Team to retain

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

such customers whenever possible.

Ross, an African-American female, alleges, in part, that TPUSA terminated her employment in retaliation for her complaints of alleged race- and sex-based discrimination and because she planned to file a complaint with the EEOC.[2] She claims that her termination violated her rights under Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e *et seq.*, and the Ohio Civil Rights Act, Ohio Rev. Code § 4112 *et seq.*

The case is presently before the Court upon Defendant TPUSA, Inc.'s Motion for Summary Judgment (Doc. #86), Plaintiff Ross's Cross Motion for Summary Judgment and Response in Opposition to Defendant TPUSA's Motion for Summary Judgment (Doc. #89), Defendant TPUSA's Reply (Doc. #90), and the record as a whole.

## II.     Factual Background

### A.     Plaintiff Ross's Version of the Events

With few exceptions, Ross's version of events provided herein is substantially taken from her deposition testimony.  (Doc. #79, *PageID##* 817-1113).  Ross first became employed with TPUSA in June 2011 as a customer service agent for one of TPUSA's client accounts and later became part of the Save Team in January 2012.  (Doc. #79, *PageID#* 886).  As part of the Save Team, Ross handled calls from customers intending to cancel services provided by one of TPUSA's client accounts – in this case, a major cellular telephone company.  Thus, when a customer would call to cancel cellular

---

[2] Ross's retaliation claims are the only claims still remaining.  (Docs. ## 34, 46).

services, Ross's main objective was clear:  try to retain or "save" the customer.  (Doc. #79, *PageID#* 887).

Ross described the area where she worked as essentially a large room containing 100 to 150 cubicles.  (Doc. #79, *PageID#* 894).  Ross stated that sometimes the office "seemed overpacked and you couldn't get a seat and sometimes it was empty."  (Doc. #79, *PageID#* 895).

Ross alleges she began being harassed by fellow coworkers and supervisors starting at the end of March.  According to Ross, the first incident occurred on March 24, 2012.  (Doc. #79, *PageID#* 958).  On this date, a supervisor, Troy Naboors, came to assist Ross with an escalated call – that is, a call in which the customer requested to speak to a supervisor/manager.  (Doc. #79, *PageID#* 959).  Essentially, Ross asserts that Naboors did not handle the call properly, the customer hung up, and she missed other incoming calls as a result.  (Doc. #79, *PageID#* 959-66).  She stated that "[h]e was purposefully messing up my queue.  That's what was harassing about that."  (Doc. #79, *PageID#* 966).  She also claims her supervisor – Brian Throckmorton – was "nonchalant" about the situation because when she requested his assistance with the escalated call he told her he was busy and arranged for Naboors to assist her instead.  (Doc. #79, *PageID#* 967).

Ross contends the next allegedly harassing or discriminatory conduct occurred a week later, on March 31st.  (Doc. #79, *PageID#* 980).  According to Ross, another TPUSA employee, Chris Stewart, approached her at approximately 7:00 p.m. and informed her that "Throck said you aren't going to get your bonus," before walking away.

3

(Doc. #79, *PageID#* 981). Although Ross was handling a call at the time, she stated she "politely put the customer on hold," went to the restroom "real quick," then approached Throckmorton, "to question [him] about what was affecting my bonus . . . ." (*Id.*). According to Ross, Throckmorton informed her the reason she would not receive her bonus was because she did not meet a quota. (Doc. #79, *PageID##* 981-82). Ross stated she "started questioning him about what was going on. And he told me that he didn't want to discuss it with me and if I keep asking him, if I keep asking him about it, he was going to fire me. That's what he stated." (Doc. #79, *PageID#* 982). As a result, Ross stated she told him "I can't return to the phone call because I'm upset about my bonus. So can I leave for the rest of the day?" (Doc. #79, *PageID#* 983). Ross alleges she only had "like an hour" left on her shift. (*Id.*). She told him she would take the .25 penalty points on her attendance record. (Doc. #79, *PageID#* 984). Ross asserts Throckmorton told her "you can go home, you can take the .25." (*Id.*).

According to Ross, Brian Harris, a more senior TPUSA manager, overheard the conversation and asked Ross and Throckmorton to step into his office. Harris provided Ross with an opportunity to discuss the situation. (Doc. #79, *PageID#* 986). She told him about the allegedly mishandled call by Naboors on March 24th and its impact on her bonus, and she complained about "the politics" of the workplace. (Doc. #79, *PageID#* 986-87).

According to Ross, Harris responded as follows:

> What he did was he said, well, because it's an issue and I understand that

your issue and you are upset about the situation, I understand, he's like, I can look at it, I can correct it.

. . .

So he was like I can get permission. I understand the issue and I'm going to pay you your bonus, he said, but he called it a system issue and I kept explaining to him that's who he, he did not acknowledge the fact that I was saying what Troy did

. . . .

That was the rectification of what happened. And he ended up giving me my bonus, but after that because I approached him in the office, that's when the harassment intensified and increased against me.

(Doc. #79, *PageID#* 989).

The next day, Ross called off work "because of the incident."  (Doc. #79, *PageID#* 992).  According to Ross, the incident was "embarrassing" and "was something I would have not have been wanting to be discussing with Brian Harris."  (Doc. #79, *PageID#* 993).

Ross claims another incident occurred on April 8th.  On this date, TPUSA employee, Chris Stewart, got on a call Ross had escalated to a "mentor."  (Doc. #79, *PageID#* 996).  According to Ross, the customer originally called to speak with Stewart – as he had previously assisted the customer with an issue – but Ross claims that when she tried to transfer the call to Stewart, he refused to accept it.  Faced with Stewart's refusal, Ross escalated the call to a "mentor," Wendell.  (Doc. #79, *PageID#* 998).  Ross complains that "Wendell got on the call.  He talked to the customer.  He talked to the customer. He talked to the customer for a long time . . . ."  (*Id.*).  After Wendell seemed to

5

have resolved the issue – approximately an hour later – he offered the customer a chance to speak to Stewart, which the customer accepted. (*Id.*). Stewart then got on the call and spoke to the customer for another hour and a half. (*Id.*). Ross claims this was harassing to her because she believes Stewart, a white male, and Wendell, an African-American male, "conspired to do that." (Doc. #79, *PageID#* 1004).

Ross claims that on May 26, 2012, a white female coworker, Amy, did not receive any calls for four hours. (Doc. #79, *PageID#* 1008). Ross stated that managers Throckmorton and Harris told Amy that nothing was wrong with the computer system, she was showing as "available," they did not know why it was occurring, and they "were laughing about it." (Doc. #79, *PageID#* 1014). Ross believes this was further harassment, "because I made a statement about politics . . . ." (Doc. #79, *PageID#* 1009).

In June 2012, Ross left early on the 12th – apparently with Throckmorton's permission – and called out sick on the 13th. (Doc. #79, *PageID#* 1031). She returned to work on the 14th with a doctor's note. (*Id.*). On June 16th, Harris approached Ross and informed her that she was being placed on an attendance "action plan" due to her number of absences. (Doc. #79, *PageID#* 1032). It was Ross's understanding that while on the action plan, "if you're absent, you call off the next 30 days you can be terminated." (*Id.*).

At that time, Ross states that Harris began discussing the "action plan" with her and asked her why she had accrued so many points. (*Id.*). According to Ross, she informed him that "the reason I've been calling off work is because I'm sick and you all are harassing me. I told him, looked him dead in the eyes and said you all are harassing

me and it's making me sick. . . ."  (Doc. #79, *PageID#* 1034).  According to Ross she also told Harris that he "didn't do anything about it," and he "was part of the harassment."  (Doc. #79, *PageID#* 1038).

Eventually, Ross asked Harris if she could just leave work at that time because she was upset, but he said "no."  Ross responded, "if [I] leave, what are you going to do?"  Harris told her "I'm going to fire you for policy and procedure."  Ross again said to Harris, "it's become a hostile work environment and I can't go home?"  According to Ross, Harris again said "no" and that if she did leave, "I'm going to fire you for policy and procedure."  (Doc. #79, *PageID#* 1044).  As Ross explains, "that's when I informed him that I'm going to the EEOC because you wouldn't do anything about it and I was like I'm going to go to the EEOC, there's nothing you can do about it because you are not even trying, you are not willing to help.  All of you all are conspiring, basically you all are conspiring to harass me on the job. . . ."  (Doc. #79, *PageID#* 1044).  Thereafter, Ross alleges Harris "was like just go back to work."  (*Id.*).

Ross's version of what happened the following day – Sunday, June 17, 2012 – and thereafter is largely based upon her memorandum in opposition (Doc. #89, *PageID##* 1418-62), supported by her signed Declaration.  (Doc. #89-1, *PageID##* 1463-1465).  Ross reported to work, worked her shift, and was preparing to leave at approximately 8:08 p.m. when she noticed her car keys were missing from her desk.  (Doc. #89, *PageID#* 1429).  Ross believed the reason she could not locate her keys was because they had been stolen by a coworker.  (Doc. #86-2, *PageID#* 1286; Doc #89, *PageID#* 1427).

Ross started searching for her keys. She searched the restroom twice, "including the trash and stalls in the bathroom," but did not locate the keys. (Doc. #89, *PageID#* 1429). Unable to find the keys, Ross approached Charles Tyree, "the only supervisor in view at the time on [her] side of the building." (Doc. #86-2, *PageID#* 1287; Doc. #89, *PageID#* 1428). Tyree informed her that he did not have her keys. (*Id.*). Ross claims that "after I gave him time to make an attempt to announce or walkie talkie another supervisor to see if my keys had been turned in . . ." she made an "announcement" in the call center. (Doc. #89, *PageID#* 1430). According to Ross, she also informed Tyree "that if my keys were not returned I would have to call law enforcement because my keys cost $600 to $1200 to replace due to the fact it was a Mercedes Benz key . . ." (Doc. #89, *PageID#* 1430). Tyree then suggested they go outside to check if Ross may have inadvertently left the keys inside her car. (Doc. #86-2, *PageID#* 1287; Doc. #89, *PageID#* 1430). Ross and Tyree exited the building and looked in Ross's car but still did not find the keys. (Doc. #89, *PageID#* 1430). At that time, Tyree went back inside the building while Ross walked across the parking lot to a nearby business to call her dad for assistance. (Doc. #89, *PageID#* 1431). After returning to her car, Ross claims that "Charles Tyree came running towards me out of the building with my keys in his hand . . . he stated 'Josh Bennington had my keys.'" (*Id.*). Ross then got into her vehicle and drove home. (*Id.*).

Ross was not scheduled to work the next day, June 18th. (Doc. #89, *PageID#* 1440). While at home on the 18th, Ross claims she placed two calls to Teleperformance's We Care hotline. (Doc. #89, *PageID#* 1441). She stated she left a message "reporting

class action discrimination on job advancement, hiring, and promotions as well as stating what I had experienced in detail and my keys being stolen as a retaliatory act, and requested a call back to discuss further what was going on at the Fairborn location." (*Id.*). Ross placed this call at 12:44 p.m. (*Id.*). Ross claims she received a call from a woman who initially stated her name was Nikki, calling from the We Care hotline, but who later identified herself as Mynette Murrell. (*Id.*). According to Ross, she told Murrell – a Human Resources Coordinator at TPUSA who Ross already knew – that she did not want to discuss the issues with her because she felt there was a "conflict of interest" as Murrell's daughter works with Ross at TPUSA. (Doc. #89, *PageID#* 1433). According to Ross, she then hung up the phone on Murrell before discussing the incident regarding the missing keys that occurred the day before. (*Id.*).

The following day – June 19, 2012 – Ross was scheduled to work but called off. She stated "I called off work because I had not gotten a call back from corporate in reference to my complaint and refused to work in a hostile environment without accommodations and was just exhausted from the whole experience." (Doc. #89, *PageID#* 1441). Later that day she received a call from Calbert DuVall, another Human Resources Coordinator at TPUSA. (*Id.*). Ross stated that she spoke with him for an hour and 25 minutes, "discussing my complaints in its entirety . . . ." (*Id.*).

Ross stated that during her conversation with DuVall, she "admitted that I made an announcement . . . 'my keys were missing and if anyone knew or had them please return them to me . . . .'" (Doc. #89, *PageID#* 1434). Ross denied using profanity. She claims

that at the end of the call, DuVall told her that he received six statements from witnesses regarding the events that occurred on June 17th, and that he would be moving forward with her termination as a result of her actions. (Doc. #89, *PageID#* 1441).

Ross contends that her termination on June 19, 2012 was "due to making complaints and reporting harassment, discrimination and the work related illness that I had incurred . . . ." (Doc. #89, *PageID#* 1442).

## B. Defendant TPUSA's Version of Events

There is no dispute that TPUSA hired Ross on June 20, 2011, that she worked as a member of the Save Team, and that she was terminated on June 19, 2012. (Doc. #86-2, *PageID##* 1266-67).

Although TPUSA disputes that Ross informed manager Brian Harris about her intention to complain to the EEOC, it does not dispute that she was placed on an attendance action plan on June 16, 2012, due to her alleged violation of its attendance policy. (Doc. #86-1, *PageID#* 1267).

TPUSA also does not dispute that Ross worked on Sunday, June 17, 2012, or that at the end of her shift she could not find her car keys. (Doc. #86-1, *PageID#* 1267). Rather, TPUSA's version of events differs as to how Ross reacted to the situation.

According to TPUSA, at approximately 8:30 p.m. on June 17, 2012, TPUSA employee Noah Banks overheard Ross yell, "who the fuck stole my keys," and "I'm going to have the cops search every fucking body." (Doc. #86-1, *PageID#* 1268). Banks also heard Ross say that she was going to "raise hell" if nobody confessed to stealing her

keys. (*Id.*). TPUSA states that Charles Tyree "tried to calm Ross down, and to discourage her from accusing her co-workers of theft, but Ross ignored him." (*Id.*). According to TPUSA, Tyree and Ross then went outside to look if she had left the keys in her car. While outside, and after not finding the keys in her vehicle, TPUSA contends that Ross then told Tyree that she "knew" who had "stolen" her keys, but refused to identify the individual. (*Id.*). Ross continued to scream at Tyree, swung an umbrella at him, and jabbed a finger in his face while "threatening to have her father 'come up here' and that there would be 'problems' if that happened." (*Id.*) At that time, Ross left the TPUSA parking lot and walked to a nearby store while Tyree went back inside the TPUSA facility, "where he promptly learned that Ross's keys had been found in the womens' bathroom." (Doc. #86-1, *PageID#* 1269). At that time, Tyree also called Jeanette Jack, "a more senior TPUSA manager, who advised Tyree to have Ross leave the call center." (*Id.*).

According to TPUSA, Tyree then went back outside to return the keys to Ross, who had also just returned from the store. (*Id.*). At this point, or so TPUSA contends, "Tyree's intention . . . was to suspend Ross, and to facilitate this, he attempted to remove the TPUSA security key card from Ross's keychain before he handed the keychain back to her. But before he could do this, or tell Ross that she was suspended, Ross snatched the keys from his hand and made a motion as though she was going to slap him in the face." (*Id.*). Ross then got into her car and drove off.

Later that evening, Tyree composed the following e-mail to his superiors, and

copied to Mynette Murrell:

At about maybe 4:30pm today I was flagged down by a few agents saying that keesya had an outburst on the floor then went to break and walked off of the floor. Due to me not hearing this I called in to a few of the agents ACD's around her as well as called in to keesya's acd.  I was also walking around her station for a few Hours as well as on a few SUP call's and did not hear anything that would alert me to this agent.  I then asked the agents who I spoke to before if they had any more issue's and they stated that they had not.  Well about 8:30pm I'm at my desk and I hear keesya start yelling and yelling curse words over the call floor.  She was saying that someone had stolen her car keys and she had better get them back. After a few min of me telling her to calm down she would not do so and then started yelling at and cursing at me. she then stated that she was going to call the police and have them come in an search everyone in the call center.  I adv her that until approved by a accm or someone higher the police will not be searching anyone.  I told her that we needed to look for her missing key's and not assume that someone had stolen them.  Knowing that she did not have her badge due to it being on her key ring, I told her that the first thing we needed to do is go out and look in her car to see if she locked them in her car.  We went outside and looked in her car and they were not locked in her car.  She again started saying that she knew they stole them.  I asked who?  She would not tell me who she was talking about. She stated that she had been having issues with agents off and on for a few days now.  I asked her if she told anyone about this and she stated that she has talked to Harris about it had she don't think that he did anything.  I asked her who the agents were and she would not tell me.  I told her that I would go in and look for them for her.  She went off on me again when swinging a umbrella in my face and said if they are not found then she will have her dad come up here and there will be problem's.  (she stated a different selection of word's however it was something I do not remember) but she did threaten the agent's and other staff that were in the center at the time.  She then went to the smoke store to get a something.  I then called J.jack to let her know about what was going on.  I went back in the center and spoke with Brandon griffin and josh bennington to see if they had found the keys and or had them given to them.  josh stated that he had them on his desk.  I went and got them and took them out and gave them to her.  She asked me where they were and I told her that they was found in the bathroom and turned in and not stolen.  I was trying to get her key card off of her key's to tell her that she is suspended however she grabbed her key's out of my hand and moved to me as if she thought about slapping me in the face.

. . . .

(Doc. #86-5, *PageID#* 1302)(without corrections).

According to TPUSA, when Murrell returned to work the next day – Monday, June 18, 2012 – she discovered eight witness statements slid beneath her office door (as well as Tyree's email in her inbox), all relating to Ross's behavior the day before.  (Doc. #86-1, *PageID#* 1270).  Murrell reviewed statements from Tiffany Allen, Noah Banks, Gillian Donohoe, Benjamin Fisher, Seth Johnson, Joanne Luke, Courtney Oliver, and Chelsea Tessier.  (Doc. #86-5, *PageID##* 1304-11).  Each was substantially similar to Tyree's version of events.  For example, Noah Banks reported that "[a]t the end of her shift, [Ross] started yelling absurdly about her keys being gone.  She said things like 'who the f*** stolen [sic] my keys['] and 'I'm going to have to [sic] cops search every f***ing body.'" (Doc. #86-5, *PageID#* 1305)(asterisks in original).  Likewise, Chelsea Tessier reported that Ross was "going off about her keys missing, and that the cops will be searching everyone. [Tyree] took her outside to help her look, I could see threw [sic] the window her yelling at him, & putting her finger in his face."  (Doc. #86-5, *PageID#* 1311).

Later that day, Murrell called Ross to hear her version of what happened.  (Doc. #86-1, *PageID#* 1272).  According to TPUSA, Ross stated to Murrell that she reported she was being harassed by her manager, Brian Throckmorton, and that she believed a fellow TPUSA employee stole her keys so they could use them to enter her house and kill her.  (*Id.*).  When Murrell asked Ross why she had not approached Human Resources with these concerns, Ross stated that she was embarrassed and that "I don't even know

who you are." (*Id.*).  According to TPUSA, Murrell explained to Ross that she had previously helped her complete human resources paperwork, to which Ross reportedly exclaimed, "oh my God, you are part of the conspiracy and your daughter is part of it!" (*Id.*).  Ross then hung up the phone on Murrell.  (*Id.*).  Murrell tried calling back but Ross did not answer.  (*Id.*).

Ross was scheduled to work the next day – June 19, 2012 – but called off work. (*Id.*).  According to TPUSA, at this point another Human Resources Coordinator, Cal DuVall, had reviewed all of the witness statements and spoken to Charles Tyree.  (*Id.*). DuVall had responsibility over human resources issues at the Fairborn facility, where Ross was working.

DuVall called Ross on June 19th, after she had called off work.  DuVall had already made a preliminary determination to terminate Ross for her actions on June 17th, but called to speak with Ross directly, as she had hung up on Murrell the day before. (Doc. #86-1, *PageID#* 1273).  According to TPUSA, Ross denied to DuVall that she used profanity during her "announcement," but admitted she accused her coworkers of stealing her keys, and that she threatened to call the police and have everyone searched.  (*Id.*). DuVall spoke with Ross for over an hour, during which time TPUSA claims that "Ross made vague, non-specific allegations that her supervisors had been harassing her and conspiring with TPUSA's human resources employees and that Murrell had it 'out for her' . . . ." (*Id.*).

When DuVall concluded that Ross had not told him anything that would change

14

his mind about her termination, he informed Ross that her employment with TPUSA was terminated effective immediately due to her behavior two days earlier, on June 17th. (*Id.*).

### III.    Summary Judgment Standard

The central issue presented by a Motion for Summary Judgment is a threshold issue – whether the case presents a proper jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A party is entitled to summary judgment if there is no genuine dispute over any material fact and if the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011).

"The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  If the movant makes this showing, the non-moving party may not rely on the bare allegations of the Complaint but must present affirmative evidence in support of his or her claims. *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992); *Street*, 886 F.2d at 1479-80.

To resolve whether a genuine issue of material fact exists, the Court draws all reasonable inferences in the light most favorable to the non-moving party. *Richland Bookmart, Inc. v. Knox County, Tenn*.,  555 F.3d 512, 520 (6th Cir. 2009) (citing

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). With these reasonable inferences in the forefront, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007) (quoting, in part, *Anderson*, 477 U.S. at 251-52 and citing *Matsushita Elec.*, 475 U.S. at 587).

In addition, while Plaintiff is proceeding in this case *pro se* – and the Court must construe her Amended Complaint liberally in her favor – it is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino*, 980 F.2d at 404; *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *Street*, 886 F.2d at 1479-80. Rather, the burden falls on Plaintiff at this stage of the litigation to designate specific facts or evidence in dispute. *Anderson*, 477 U.S. at 250; *Metiva*, 31 F.3d at 379; *Guarino*, 980 F.2d at 404-05; *Street*, 886 F.2d at 1479-80.

## IV.    Analysis

### A.    Title VII Retaliation Claims

Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e-3(a). A Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir. 2008). Direct evidence is evidence that, if believed, requires no inferences in order to conclude that

unlawful retaliation motivated an employer's action. *Id.* at 543-44. Direct evidence "requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003)(emphasis omitted). Plaintiff has not presented any direct evidence of retaliation in this case. Accordingly, the Court analyzes her retaliation claim under the three-part burden-shifting framework set forth in *McDonnell Douglas*. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 207 (1981)).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action. *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). If the defendant articulates such a reason, the plaintiff must then show that the reason provided is merely a pretext for discrimination. *Id.* at 675. In addition, the Supreme Court recently made clear that unlike other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __ , 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). The analysis under Ohio law is identical. *Abbott*, 348 F.3d at 541.

### B.    Prima Facie Case

### 1.    Plaintiff's Burden

Plaintiff bears the burden of establishing a prima facie case of retaliation by

showing: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Jones v. Johanns*, 264 F. Appx. 463, 466 (6th Cir. 2007)(citing *Abbott*, 348 F.3d at 542, and *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).

## 2. Protected Activity

"Protected activity" is defined in 42 U.S.C. § 2000e-3(a) as "oppos[ing] any practice made an unlawful employment practice by this subchapter . . . ." The term "oppose" is not defined by the statute but is provided its ordinary meaning: "[t]o resist or antagonize . . .; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't*, 555 U.S. 271, 276, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009) (quoting Webster's New International Dictionary 1710 (2d ed.1958)). According to Ross, she informed TPUSA manager Brian Harris on June 16th – after he placed her on an attendance action plan – that she was planning to file a complaint with the EEOC regarding alleged discrimination. (Doc. #79, *PageID##* 986-87, 1044). Ross also stated that she left a message on TPUSA's We Care hotline complaining about discrimination, as well as informed Mynette Murrell and Cal DuVall – both human resources personnel – of same on June 18th and 19th, respectively. (Doc. #89, *PageID#* 1433-42). Drawing all reasonable inferences in favor of Ross, a jury could reasonably conclude that she engaged in protected activity.

### 3. Defendant's Knowledge

"In most Title VII retaliation cases, the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002). Here, Ross states that – in addition to leaving a message regarding discrimination on TPUSA's We Care hotline – she complained about alleged discrimination to Harris, Murrell, and DuVall. She also states that DuVall is the individual who terminated her employment. (Doc. #89, *PageID#* 1441). Accepting these allegations as true, a jury could reasonably conclude that the TPUSA official who terminated her employment knew of her protected activity.

### 4. Materially Adverse Employment Action

It is undisputed that Ross was terminated on June 19, 2012. As such an action was, of course, materially adverse to her employment, she has satisfied the third element of her prima facie case. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

### 5. Causation

To establish a causal connection, a plaintiff must "'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)(citations omitted)). "Where an adverse employment action occurs very close in time after an employee learns of a protected activity, such temporal proximity between the events is

19

significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Ross claims she complained of harassment to her manager on June 16th and to human resources personnel on June 18th and 19th. She was terminated on June 19th. Although it is undisputed that Ross was also involved in an incident in the call center regarding her missing keys, the very close temporal proximity between her complaints and her termination – viewed in a light most favorable to her – is sufficient to raise a reasonable inference that Ross's protected activity was the reason for her termination. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)("The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." (citing *Avery*, 104 F.3d at 861)).

### C.     Pretext

TPUSA asserts it "fired Ross after concluding that she had engaged in an inappropriate workplace outburst on June 17, 2012." (Doc. #86-1, *PageID#* 1276). Ross's unprofessional behavior, TPUSA contends, was the nonretaliatory reason for her termination.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

To create a genuine issue over whether TPUSA's reason is pretext, Ross must produce "sufficient evidence from which a jury could reasonably reject [her employer's] explanation of why it fired her." *Chen*, 580 F.3d at 400. As discussed below, Ross has failed to do so.

Ross argues that "TPUSA['s] reason for termination is false and was used to cover up the fact that I was being harassed and discriminated against and participated in reporting the harassment . . . ." (Doc. #89, *PageID#* 1446). To show pretext on the grounds that TPUSA's reason for Ross's termination had no basis in fact, however, Ross "must allege more than a dispute over the facts upon which [her] discharge was based. [Sh]e must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). To show an honest belief, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Moreover, it is "not require[d] that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* at 807.

Cal DuVall – the Human Resources Coordinator who made the decision to terminate Ross's employment with TPUSA on June 19, 2012 – stated in his declaration that he "investigated [the] incident involving Keesya Ross by reviewing the witness statements that had been submitted to Murrell, including Charles Tyree's email describing

21

the event, and by speaking to both Murrell and Tyree about the incident." (Doc. #86-4, *PageID#* 1296). He also stated that he spoke to Ross – who had hung up on Murrell the previous day – and that after speaking to her for over an hour, "I concluded that Ross had not told me anything during the call that changed my mind about whether or not she would be discharged for her outburst on June 17. At the end of the call, I informed Ross that her employment with TPUSA was terminated effective immediately, because of her behavior on June 17." (Doc. #86-4, *PageID#* 1297).

Although Ross disputes the veracity of the witness statements DuVall read – arguing that the allegations contained therein that she used profanity or threatened employees are untrue – she provides no evidence to rebut DuVall's, and therefore TPUSA's, "honest belief" regarding the truth of these witness statements, or any of DuVall's other findings from his investigation. Again, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807. Ross has simply failed to provide any probative evidence suggesting that TPUSA did not honestly believe the reasons it gave for terminating her employment. *See Anderson*, 477 U.S. at 257. ("[P]laintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

Moreover, Ross's own version of the events is largely consistent with much of what DuVall stated. For example, Ross acknowledges she was told by DuVall at the time he terminated her employment that it was as a result of her misconduct in the call center

two days earlier, on June 17th. (Doc. #89, *PageID#* 1442). Ross also acknowledges that DuVall spoke with her over the telephone for close to 1 ½ hours as part of his investigation about the incident. (Doc. #89, *PageID#* 1441). She further acknowledges that DuVall told her – prior to her termination – that he had reviewed witness statements regarding the incident indicating what she did. (*Id.*). Ross also does not dispute that she believed someone stole her keys on June 17th and that she made an "announcement" in the call center "about my keys being stolen." (Doc. #89, *PageID#* 1446). Simply put, Ross has failed to create a genuine issue concerning whether TPUSA's reason for her termination lacked a basis in fact.

Even Ross's version of the events provides support for DuVall's non-retaliatory reason for her termination – her unprofessional behavior in the call center. Ross acknowledges she made an "announcement," without permission, in the call center. (Doc. #79, *PageID#* 889). Ross's shift may have ended for the day, but other employees were still working and were, at the very least, distracted from their work duties by Ross's "announcement." Moreover, Ross, and her fellow coworkers, were employed in a challenging role handling calls on behalf of a major cellular telephone company, often from unhappy customers seeking to cancel services, in a call center that Ross described during her deposition as "constantly flowing." (*Id.*). Ross clearly described the understandable difficulty of such a position during her deposition: "Like as far as I came there for eight hours, I was on the phone, that's what my job consisted of and it was demanding, it was calls. . . . That job was demanding. I had to have a headset on and be

on calls all day long and that's what my job consisted of." (Doc. #79, *PageID#* 889). In such an environment, profanity-laden or not, Ross's self-described "announcement" – an "announcement" there is no dispute she made, without permission, and which multiple employees heard – alone provided support for TPUSA's nonretaliatory reason to terminate her employment: her unprofessional behavior.[3]

To the extent Ross also attempts to prove pretext by showing that TPUSA's reason for terminating her employment – her behavior on June 17th – did not actually motivate its decision to terminate her, she has again failed to carry her burden. "[I]n making such a motivation argument, a plaintiff must show that the 'sheer weight of the circumstantial evidence of [retaliation] makes it more likely than not that the employer's explanation is a pretext, or coverup." *Herrera v. Churchill McGee, LLC*, 545 Fed. Appx. 499, 503 (6th Cir. 2013) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Ross has simply failed to provide any affirmative evidence that her "announcement" in the call center on June 17th did not constitute unprofessional behavior or did not actually motivate TPUSA's reason for terminating her employment.

Ross also has not shown that TPUSA's proffered reason for her termination was insufficient to motivate its action. In order to make this showing, Ross must present

---

[3] Ross also appears to seek to excuse her behavior by arguing that "even if [the 'announcement'] was viewed [as] unprofessional, I had already given notice [of] my current health status to Brian Harris (Assistant Call Center Manager) of situational anxiety . . . ." (Doc. #89, *PageID#* 1447). Even assuming Ross's "announcement" can somehow be attributed to such a disorder, this does not call into question TPUSA's legitimate nonretaliatory reason for termination. *See Dykes v. Wolohan Lumber, Co.*, 2007 U.S. Dist. LEXIS 28927(S.D. Ohio 2007); *Whitten v. Fenner Dunlop Conveyor Sys. & Servs.*, 2013 U.S. Dist. LEXIS 104958 (S.D. Ohio 2013).

"evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer,* 29 F.3d at 1084. Ross has identified no employees who acted in a "substantially identical" way to the way she acted on June 17th and who were not terminated.

Regardless of Ross's subjective beliefs as to the reason her employment was terminated by TPUSA, she has failed to raise a genuine issue of material fact as to whether TPUSA's proffered reason for her termination was pretextual. As a result, no jury could reasonably find that TPUSA retaliated against her in violation of her rights under Title VII or the Ohio Civil Rights Act. Accordingly, TPUSA's motion for summary judgment is well taken.

### IT IS THEREFORE RECOMMENDED THAT:

1.  TPUSA's Motion to Dismiss (Doc. #70), Ross's Motion for Extension of Time to Respond to Defendant's Request for Production of Documents (Doc. #72), and TPUSA's Motion for Protective Order (Doc. #74) be DENIED as moot;

2.  TPUSA's Motion for Summary Judgment (Doc. #86) be GRANTED;

3.  Ross's Cross Motion for Summary Judgment (Doc. #89) be DENIED as untimely and moot;

4.  The Court certify pursuant to 28 U.S.C. §1915(a)(3) that for the foregoing reasons an appeal of an Order adopting this Report and Recommendations would not be taken in good faith, and consequently, leave for Plaintiff to appeal *in forma pauperis* should be denied; and,

5.    The case be terminated on the docket of this Court.


June 5, 2014

                                    _____s/Sharon L. Ovington_____
                                        Sharon L. Ovington
                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).